at L. Mr. Pugh for Petitioner, Mr. Doyle for Respondent, Mr. Frye for Intervener. Mr. Pugh for Petitioner, Mr. Frye for Intervener. Mr. Pugh for Petitioner, Mr. Frye for Intervener. Good morning. Good morning, Mr. Pugh. You and I were both here yesterday, I believe. Yes, back again. Go ahead. This time for Louisiana Environmental Action Network and Sierra Club. As this Court has held repeatedly, emission standards for a source category under Clean Air Act Section 112 must include limits on each hazardous air pollutant that category emits. EPA acknowledges that its emission standards for the pulp mills category is in violation of this requirement. They don't include limits on all hazardous air pollutants that pulp mills emit. Section 112d6 of the Act requires EPA to review and revise as necessary the, quote, emission standards promulgated under this section. EPA asserts that this one phrase, emission standards promulgated under this section, unambiguously restricts the agency to reviewing and revising the individual emission limits that is already set for specific pollutants. According to the agency, the statute neither authorizes nor requires it to revise its emission standards by adding limits for pollutants that are currently uncontrolled. And what part of this statute would you say does require them to do what you say they should have done? Section 112d6, Your Honor. Would you read the part of it that you say compels that? Sure. 112d6 requires EPA to review. No, read it to me. Tell me what it says. It says EPA has to revise as necessary. Has to do what? To revise as necessary. Can you give me the language of the statute? That really is the language of the statute, Your Honor. It says revise as necessary the emission standards. It doesn't say that. It says that in context of something else. What is the full sentence? Oh, you want me to get the right? I can address the parenthetical, Your Honor, which is revise as necessary taking into account developments and practices, processes, and control technologies. And you would say that that requires them to promulgate new standards for different pollutants? Yes, Your Honor. I do think it requires where, as here, EPA acknowledges that its existing standards are unlawful because they lack standards for those pollutants. And given this Court's very clear and very repeated and very clear holdings, that EPA's emission standards must include limits for those pollutants. But I would also point out, Your Honor, that you don't even need to reach that here because of EPA's interpretation of the Act. And with the Court's permission, I'll explain, I think, very quickly why it's unlawful. EPA says that one phrase, emission standards promulgated under this section, restricts it from making these revisions. And that interpretation is wrong because emission standards promulgated under this section are emission standards for source categories. I thought it said it had discretion to do it but doesn't want to do it because the time was too short and they have other priorities. Well, EPA is parsing the different statutes there. EPA says it has discretion to do it under another part of the Act. Under 112D2 and 3. Right. But it says it doesn't even have authority to do it under D6. Although in the past it's done it in a D6 review by cross-reference to D2 and 3. Right. And so, I mean, I guess it's a little bit of a nomenclature question whether it has authority under D6. But at a D6 review, given the D2 and 3 authority, it has, in fact, several times in the past, done just what you're saying it's required to do in this case. Is that correct? Yes, Your Honor. It's been doing it consistently. In virtually every rulemaking, it's been setting the missing limits. It just says it's doing it. And it's been setting the missing limits in the course of its 112D6 rulemakings. It just says it's acting under a different authority. And is this the first time you're aware under D6 where it has declined to do this? Yes. This was the first time. And why has nobody sought mandamus on the petition for rulemaking that I gather has been languishing for a decade on the same issue? Is that right? There's a petition for rulemaking. Yeah, it's true. There's a petition that dates 2009, and it's certainly true that somebody could come in and bring an unreasonable delay suit. In this case, the issue seems urgent. There are literally millions of pounds of uncontrolled hazardous emissions coming out of pulp mills every year. Although it would be possible to file an unreasonable delay suit, that's a long process. The unreasonable delay standard is different. We felt that it was important to get this on a deadline, and when EPA refused for the first time, we wanted to make sure that EPA sets these limits as soon as possible. Why was EPA's failure to address this when it originally set the standards for this category of sources? Why was there not a challenge to its under-inclusiveness in terms of the covered HAPS at that time? Your Honor, I don't know why it wasn't challenged at that time, but I would say this is a statute that requires EPA to review and revise its standards, and here EPA made a decision under Section 112D6. And this is the first 112D6 review on these pulp mills since the standard was released? Yes, this is the first one. If I can come back to EPA's statutory interpretation, Section 112D6 requires EPA to review and revise its emission standards for source categories, not just the limits it sets for individual pollutants. And the reason that's so clear is that all the provisions in the Act that direct EPA to promulgate emission standards, Sections C2 and D1 and Section F2, all direct the agency to promulgate emission standards for, quote, source categories. Those emissions for source categories are the, quote, emission standards promulgated under this section that 112D6 requires the agency to review and revise. Now, emission standards for source categories are the whole package of limits and other requirements that apply to the category. EPA can plainly revise these emission standards both by adjusting the individual limits that they already include and also by adding new limits or deleting old ones. All of these things are revisions to the emission standards for the source category. Have any HAPs been added to the list since the 1998 amendments? No. There's one petition that has moved fairly far through the process for n-propyl bromide. And there was a petition. EPA appears to think that it meets the criteria. And I think that actually raises an interesting question because once EPA, assuming that EPA does add this additional pollutant under the agency's interpretation of the law, there is no obligation to ever set limits for it. Well, maybe there's a background legal obligation, but it's in their discretion when and how to use the 112-D2-3 authority to do so. I gather that's their position. I think that's correct, but I'm not sure that EPA even agrees it has an obligation under D2 or D3. EPA said it has the discretion to do it. It doesn't say it has the obligation to do it under D2 or D3. So even the whether EPA does it under the agency's interpretation is in question. Because EPA has misinterpreted this phrase, emission standards promulgated under the section, and because EPA's refusal to set the limits on the uncontrolled hazardous air pollutants rests on that interpretation, the court can stop there. It doesn't need to look any further because once, if it were an agency, misconceives the law, the order cannot stand. This question may likely just betray my ignorance, but in setting the standards, the EPA looks at performance of sources, and if the sources aren't yet regulating or controlling for a half, how does that work? Like where does the substance of the limit come from in the real world? Well, Your Honor, I think when Congress directed EPA to set these floors based on the emission levels that the best sources are achieving, what it was exploiting, you know, in a good way, was that within an industry there's a wide range of performance levels. Some sources are doing more than others, and what it wanted was to make all the sources clean up at a minimum, to clean up what was already being done, because they knew that what already is being done can be done. And so I think it was in this Court's holding in the National Lime Case back in 2000 that the Court observed it doesn't matter whether sources are doing, you know, whether sources have put on controls or whether their reductions are the result of some intentional strategy. Some sources are doing better, and that drives the floors. Plus the second-tier review of whether they can be more ambitious, taking costs and other factors into account. Right, right, and then the whole idea was to get the maximum degree of reduction that can be achieved, but at the very least what the best sources are. So really the standard is, I mean, it's pretty low. If nobody's controlling for these pollutants and EPA has to take them into account, it's going to just be looking at what the best performers are doing, which might be pretty modest. It might be modest. I mean, it's certainly hypothetically true that you could look at an industry with 100 sources and they're all doing exactly the same, and then the floor wouldn't have any real bite. Or would have minimal bite. Or would have minimal bite. But we don't know that, and it seems very unlikely. And is there no role, I mean, when you read the rule, they talk about that this is a waning set of facilities and, you know, the category is getting smaller and it's a lot of money to put into controlling. Is there no role for that under your theory? Well, not on this point, Your Honor, no. I mean, first of all, there are 108 pulp mills. They're releasing literally millions of pounds of hazardous air pollutants into communities every year, and much of that is completely uncontrolled. And bioaccumulative. Some of it is bioaccumulative. So that doesn't play into providing these basic protections that Congress intended. How many pulp mills were there when the CAA was passed? I don't know, Your Honor. A lot more than 108, weren't there? It's very possible that the industry is declining. As I said, I don't think the Court needs to go any further than EPA's misreading of the Act. But very briefly, if there were some ambiguity about whether the statute requires EPA to look at emission standards for source categories or individual emission limits, as EPA assumed in the record, the rule would still need to be remanded. First of all, because EPA claims the statute unambiguously restricts it. They're not taking that position in their brief, though. Well, that's a quote from their brief, Your Honor, page 30. Well, they seem to accept that standards are standards as applicable for sources as opposed to standards for individual HAPs. I mean, I can ask them. Well, Your Honor, their statutory interpretation is that it actually is. They're talking about limits for HAPs, and that's the only way it could possibly work. The only way that language, emission standards promulgated under this section, the only way that could possibly restrict EPA to looking at the limits it has already set, would be if it meant those emission limits it has already set for individual pollutants. Well, or the package standard is only as broad as the package originally designed in 2001. And, yes, I guess it counts the HAPs as setting the scope of the source-specific standard. So if they're only looking at, what is it, eight or seven, then that would be the only ones they would have to review. And I think they also say only for technology. Well, they do say that. I guess the point is, if it means categories, then their interpretation can't possibly work. Because if you look at the emission standards for source categories, then they can be revised by adding additional limits. The only way they can't add additional limits is if the only thing that the statute lets them look at are those limits that it has already set. The other point is, and I would like to reserve some time for rebuttal, so I can stop here if the Court doesn't have any questions. All right. You've got two minutes and 18 seconds. Thank you, Your Honor. All right. Mr. Doyle. Good morning. May it please the Court, I'm Andrew Doyle from the Department of Justice. At council table with me is Scott Jordan from the Environmental Protection Agency. The statutory provision at issue in this case, 42 U.S.C. 7412 D-6, does not require the EPA to develop and promulgate initial new emission standards for the hazardous air pollutants that the original 2001 emission standards left unaddressed. EPA's obligation under D-6 is narrower. By its plain terms, D-6 requires the EPA only to review, quote, emission standards promulgated, close quote, under the ACTS HAP program, and then to revise those previously promulgated standards as necessary, taking into account specified factors, and those factors are developments in practices, processes, and control technologies. Here, the EPA did everything that D-6 required the agency to do. Number one, the EPA conducted a thorough review of the emission standards for pulp mill combustion sources that have been on the books and never challenged in court since 2001. And number two, the EPA made revisions to those preexisting standards in light of developments in practices, processes, and control technologies. In addition, in this case, every action that EPA took pursuant to D-6 is uncontested by the petitioners. That is, the petitioners do not challenge the EPA's findings that certain technological developments have occurred since 2001. Mr. Doyle, what would happen if EPA did recognize a new HAP? How would that come on board on the standards that they already have for source categories that they're already regulating? Judge Pillar, you hit the nail on the head about the agency's position on that, that they recognize they would have an obligation under D-1 through 3 to promulgate emission standards for that newly listed HAP, but they would have discretion as to when to do it. I think as a practical matter, the agency would address that timing in a final agency action promulgating the addition of that HAP to the list. In the past, the agency has, as far as I'm aware, and correct me if I'm wrong, has done that kind of bringing new HAPs into the existing category standards in the D-6 review. And it's your position, I take it, that that's permissible to do that but not required? Correct, Your Honor. And you referenced this when you were questioning my opposing counsel. Our position on that is that EPA, this case is not about whether EPA has an obligation to set emission standards for each and every HAP from a source category. It does. National LIME in 2000 established that. The question is whether EPA has that obligation solely under D-6. It does not. Or at all under D-6. It does not under D-6 at all. But Your Honor is correct that EPA has the discretion to combine those two kinds of rulemakings into one proceeding, and it has done so in the past, as Your Honor has noted. So this is the first time you agree with Mr. Pugh that this is the first time that EPA has conducted a 112 D-6 rulemaking for a source category where the source category emits HAPs that have not been included in the source category standard and declined to address them during that, I don't want to say under D-6. I understand your position is that it would be addressing them under D-1 to 3, but this is the first time when there were HAPs that it was aware were being emitted, there were no limits for those HAPs, and it didn't address that in the context of a D-6 review? Yes, I think he's right about that. I'm not aware of any other instance where EPA has declined to do that. Here, it was unique in the sense that this was a court-ordered deadline. We had sought the district court to give us more time. We got less time than what we wanted. We had the data to do the risk analysis and the data on developments, but we didn't have the data for actual emissions that we would need to promulgate or address the MAC standards for these unaddressed HAPs. Can you explain that a little bit more? You had the data on the not yet regulated HAPs that these sources do emit? We had projection data or data that can help you give projection as to HAPs that have been unregulated by the 2001 emission standards, but we didn't have actual emissions data for those unaddressed HAPs, and so that's a different kind of data and analyses that would have to be done. Why does that make a difference? It makes a difference because under the risk assessment, that is the F-2, those are projection-based generally in terms of assessing the level of risk and whether that's acceptable to public health. When you are setting the MAC standards, it's shorthand there for maximum achievable control technology. As Your Honor noted, that's a tiered analysis, and as my friend on the other side noted, that you're looking at the best controlled sources and you're building from there. It's a different kind of data set for that. I didn't see that in the record on this rulemaking, making that distinction. Is it in there? It's abbreviated. I'll grant you that. J.A. 8, the EPA mentions that it might choose to... J.A. J.A. 8. Column. Column. Let me get that for you. It's all right. Don't stop your argument. I have a green tab on that. I can give you that. That's the middle column there. I'm sorry, the third column. And then also on J.A. 378, which is the response to comments, EPA notes that it would have to assemble the data and information necessary to conduct the D2 and D3 analysis. So by implication, EPA doesn't have that data and information currently, and that is correct. And it made this point to the district court as well. I was just going to say, in the district court, though, there was a sustained discussion of how much time EPA needed and the time of two years was given, and there was no objection from EPA. I think the understanding is clear in that case that it was talking about MACT-worthy or MACT-supportive data. And indeed, I mean, under the statutory scheme, with the schedule that Congress contemplated, it was supposed to do the whole country in two years, or at least a big chunk of, what, 40 sources. So I guess I'm wondering, even if we were to apply the most deferential standard, the well-earth standard, why is it not, in violation of that, that the only reason EPA gives is that we don't have time, when the time was actually negotiated and deemed to be ample, and it's been a very long time. Right. Well, the reasonableness of EPA's decision not to combine these two distinct kinds of rulemakings is twofold. Number one, first and foremost, in terms of if you're looking for statutory criteria as to govern EPA's decision about what to do, our position is it's taken into account all of the statutory relevant factors, that is, the technological advancements to 2001. So your position does then depend on limiting the D6 analysis to technological advances, because taking into account is a very soft way of limiting that. I mean, you take into account, you know, when I hire clerks, I take into account their GPA, but I certainly don't limit my analysis to that. And it is correct that EPA's decision about whether to combine these two distinct rulemakings relied on more than that, but the state farm standard for arbitrary and capriciousness asked, did the agency consider all the relevant factors, and of course we believe we did because this is a D6 proceeding first and foremost, and EPA considered all of the factors that that statutory provision makes relevant. But in terms of the analysis about the EPA believed it lacked time to do all of the analysis, the different kind of analysis that D1 through 3 requires, it's very abbreviated on that. Your Honors looked at the district court briefs. We did request longer than two years, and the district court said, well, and noted our position that we had the data to do the F2 analysis and the development data, but we did not have the other kinds of data. Wasn't there a data call, it was in 2011, and there was a 100% response rate for industry. That wasn't data that you could have used to set MAC? It was not, Your Honor. That's my understanding of it. But that was data for industry-provided emission factors that are then used for the projections that you do in the F analysis, but I don't believe that's the data that was required to do the MAC floor analysis. Because, again, you have to get actual emissions information for the unaddressed HAPs. If Your Honor would like more information about that data distinction, we're happy to provide a supplemental brief so I can be more precise for Your Honor. But I will note, just to go back to the other JA side at 378, talks about the different analyses and the data that's lacking on what they would have to do to fulfill their obligations under D1 through 3 with respect to the unaddressed pollutants. I'm getting short on time. I have two quick points. One is that EPA's reading of D6 is reasonable because it does not, it preserves, it does not cut off remedies. As Your Honor, Judge Pillard noted, there's still the remedy, of course, of your right to timely seek judicial review of emission standards, and there's also the after arising component of that, neither of which are invoked here. There's also the right under 7604A of the Clean Air Act to seek to enforce the rulemaking petition and EPA's response to that. At the end of that paragraph, you referred to the reasonableness of the interpretation. Is the government taking a Chevron 2 position or a Chevron 1 position? We're taking both. We're saying EPA below has advanced its best reading of the act. It has brought its experience to bear about how this works and why it fits with the structure. And that you can uphold it under either prongs of Chevron is our view. Are you taking the position attributed to you by petitioners that standards means HAP limit levels as opposed to standards governing source categories? We, EPA, there's nothing in the record that says that EPA isn't adopting anything other than what the statute, how the statute defines emission limitation, or emission standards, as well as the regulatory definition specific to the hazardous air pollutant program. Well, both of those sources, the statute and the regulations, as well as our precedents, seem to talk about standards as source governing as opposed to a standard being HAP specific. So why is the plain language of 112D2, which calls on the agency to review and revise as necessary emission standards promulgated under this section, review and revise as necessary emission standards promulgated, if there's an emission standard for these pulp mills and, as you concede, under D2 and D3, there need to be limits placed for any HAPs that they emit that are on the list, why isn't 112D calling on EPA to review and revise as necessary emission standards to bring into those emission standards some limits for previously uncontrolled or unaccounted-for HAPs? That's not the best reading of the Act, Your Honor, because of the statutory phrase emission standards promulgated under this section. Promulgated versus revision is a term of art that this Court has recognized in surface finishing and other cases, including a concurring opinion from Judge Wald. And I would also note that it's reasonable for EPA to construe that phrase, together with the technological development focus of D6, as something that is talking about the standards in existence, not remaining to be promulgated. So this is where I think why petitioners are attributing to you a HAP-specific interpretation of standard, which I take it you're resisting, but because the standard promulgated is the standard governing the emissions of a pulp mill or components thereof, and the revision of the standard promulgated is a revision of that to include necessary components that it doesn't include. So it's not a different standard, it's the standard that was promulgated. It was just promulgated in an under-inclusive form, I think, is their argument, and I'm trying to understand what your counter to that is. And our counter to that is that to the extent that the original emission standards are deficient, and there's a very good argument, if not a clear conclusion that they are, that that is what Congress addressed that through the judicial review provision that you have 60 days after the original promulgation to challenge it. If not then, then you have to do it within 60 days after a rising ground. And then after that, done. You're done in terms of that provision. Recall that here petitioners did submit a rulemaking petition. The Act expressly provides a remedy to get an answer to that. I will note for the record that we have done, the EPA has done, taken action in response to that petition. Only one issue on the pulp mills, and that issue is the startup shutdown and malfunction issue. That's in their rulemaking petition. We addressed that below, not under D6. But it's been a decade on that. And we have taken 13, we have filled gaps for 13 sources. We have not done so for pulp mills. But there has been movement on that petition. But the point, back to your Honor's question, is that Congress designed remedies, EPA's interpretation preserves those remedies. If you missed the boat on challenging the original promulgation, submit a rulemaking petition. If you believe EPA is taking it unreasonably too long, you can enforce that through a U.S. District Court suit to compel EPA to respond to that petition. So it's not District Court, it's Mandama. I mean, it's not Mandama, it's District Court. It's District Court. 7604A makes clear it's in District Court. And that's the unreasonable delay action? Correct. The Court has no further questions at this time. Oh, I did have one more question, which is, is it in the record or do you know what are the HAPs? How many? What are they that are at issue here? I know that were highlighted mercury, dioxins, hydrochlorides. I believe that is addressed at JA378, which is the response to comments, where EPA at the bottom of that page goes through the pollutants that are left unaddressed, that are the subject of petitioner's comments below, and speaks to that issue. Some of them have symbols that I frankly don't remember what they stand for. That's where it's listed. The last paragraph there, mercury, dioxins, ferrons. That paragraph, correct. And then it continues on to the next page. Particulate matter. Gaseous organic hazardous pollutants. Okay. And then it goes on to say that these estimated emissions were included in the risk modeling file. And so EPA is finding here, unchallenged by petitioners, that the risk to public health and the environment is below the ample margin of safety. And so that leads into that discussion there. We request that the petitions for review be denied. Thank you very much. All right. Mr. Fry. May it please the Court. I'm Russell Fry, representing Intervenor American Forest Paper Association. I only have a few minutes, so I'd like to try to clarify a few things that have come up so far. First of all, I do want to emphasize how important the 60-day limit on petitions for review of EPA actions is to the affected industry. But I also want to talk about this notion that a bunch of pollutants are unaddressed, unregulated, uncontrolled, and also that the only way they can be addressed is through 112D6, the action that EPA took that's being challenged in this rule. First of all, just to make clear, I think it already should be, but it's critical for industry to have the repose that Congress provided in Section 307, limiting petitions for review of EPA actions to 60 days. There's no assertion that there's some petition for review that's been filed with respect to the original MAC standards, even though petitioners don't dispute that they knew about the precedent that they claim required those standards to be written differently, and they knew about, or they could have known because it was in the record, the very same pollutants that they now say make the standards unlawful because they weren't regulated at the time. So if you interpret 112D6, despite the absence of any discussion in the legislative history that that's what Congress intended, to be that essentially that 60-day repose that Congress provided isn't available. Industry won't know whether it should invest or not invest, what requirements are going to be, even though they haven't been challenged at the time. There's been a lot of talk in the brief and some today about unaddressed, uncontrolled pollutants. These pollutants aren't uncontrolled or unaddressed. They've been addressed, first of all, under a number of other statutes and with the controls that are already in place, and we discussed that at pages four through seven of our brief, but also they've been addressed in the very way that Congress intended, and as EPA explained in its brief, this stepwise progression after EPA takes this initial cut to figuring out what the technology-based standards should be, then eight years later, Congress tells EPA to go back, determine whether those standards are sufficient to protect the public with an ample margin of safety, and in fact, EPA decided that in this case, not just for the pollutants that have specific numeric limits in the existing standards, but also for all the other pollutants that the petitioners have claimed are unlawfully missing. So that process took place, and EPA regulated those other pollutants by addressing them, by determining that there's no need for additional limitation to protect public health and safety. This question about emission standards for source categories, first of all, the references that petitioners made to legislative history are really irrelevant, and I think Judge Pillard, you kind of focused on that. That's just, yes, the emission standards are promulgated for source categories, not one pollutant at a time. But emission standards, that term is used even by petitioners in their brief in many different ways and in contradictory ways, so you can't just focus on that term as an interpretation, as a determinant of what 112D6 requires. And we discuss in our brief in detail some of these statements, contradictory uses of emission standards by the petitioners themselves. So, Mr. Frye, I thought you just said a moment ago that the EPA did address the other pollutants and regulated them by determining that there's not a need for additional limits under the subsection F standard? Yes. That there's an adequate margin of safety. Right. But didn't regulate them in the sense of doing any kind of MACT analysis, and it's your view that that's not an obligation? Well, it's certainly not an obligation that is part of the 112D6 process. The point I was making is that there's already been a determination, and in this risk analysis under 112F, EPA could have concluded that additional limitations were necessary for these supposedly unaddressed pollutants. The statute provides that mechanism. It also provides that if there's no unacceptable risk, EPA doesn't have to impose limitations beyond what has already been promulgated. What's your view if there were a new HAP added after? I know the 112F review was a one-time review. If that had already happened and a new HAP is discovered that's actually very dangerous and added to the list, there's not any nondiscretionary requirement that EPA address that, either under 112D6 or under review that's allowed under the 307 opportunities. That's just up to EPA to get its act together and figure out how and when and whether to regulate that? I think Your Honor probably accurately characterized it when you were questioning Mr. Pugh. The fact that there is no specific statutory deadline doesn't mean there's no requirement to regulate that pollutant, and there are lots of provisions in the Clean Air Act and, of course, in other statutes that require agencies to take action that isn't associated with some specific date by which that action has to be taken. And the statements in Petitioner's briefs that there's no way to regulate these new HAPs and it totally eviscerates the provision for listing new HAPs, just because there's no date certain by which EPA has to take action, that certainly doesn't mean there's no regulation. There's no requirement for EPA to regulate that newly listed HAP if it needs to be regulated. And as EPA has pointed out, there is an opportunity to petition for rulemaking if the petitioners believe that some new pollutant needs to be regulated for a particular source. And that was done in this case a decade ago, and that hasn't even acted on. So, I mean, this is a statute that Congress enacted and revised because, you know, I mean, it's just human nature and, you know, economic priorities that it's not going to happen quickly unless there's some impetus, right? I mean, they had to take over the listing of the HAPs because the agency was somewhat overwhelmed and wasn't getting around to it. And so that very statute is one that you think Congress intended to leave with no temporal triggers from the outside, just like EPA is going to figure it out and incorporate limits on those HAPs in existing standards without any nudge under 112-D6. Well, in the first place, this is all theoretical at this point because the act's been around for almost 30 years and no HAP has been added. So there hasn't been the catastrophe associated with this supposed gap in regulatory authority so far. But, you know, there were deadlines for the initial MAC standards, and that didn't keep them from stretching out over decades either. I'm not sure which way that cuts, though, right? Well, your assertion that these pollutants fall into this sort of unregulated pocket that's different from all the others, as a practical matter, it hasn't happened and it's not true. But the real point, an important point, is Congress did provide a deadline for newly listed source categories, two years. Okay? That's specifically in the statute. It didn't provide that deadline for newly listed pollutants. Okay? So according to petitioners, there is a deadline, but instead of two years, it's eight years because it's sort of tucked in there under the 112-D6 review. And that, I mean, there's no obvious reason why that eight-year deadline is better than an opportunity to petition for review whenever the petitioners feel it's appropriate to regulate an additional, a new pollutant. And the fact that they sat on their rights and didn't take action that's provided under the statute to get EPA to act on that rulemaking petition is, you know, it shouldn't be, that shouldn't be a reason for concluding that Congress must have meant to provide some other mechanism through 112-D6. I see my time is up. If there are any other questions, I'd be happy to go some further. Okay. All right. Thank you. Thank you. How much time does Mr. Pugh have? Okay. Very quickly, a few points. One is about the developments parenthetical, and this gets back, I think, to your initial question, Your Honor. The first point on the development argument is that it appears nowhere in the record. This is a close talk assertion by EPA's lawyers made up for the first time in their brief. They don't cite it any part of the record where it appears, and in fact, the only rationale for EPA's refusal to set these limits appears at page 8, which counsel cited, and page 378. That's the final rule in the response to comments document. It appears in the paragraph. Nowhere anywhere in the record did EPA ever claim that the revisions that are necessary under the statute are limited to those with a nexus to the developments. And as this court has held and the Supreme Court has held, the court should not accept post hoc statutory interpretations. That's the Council for Urological Interest case in this court, and most recently, or very recently, the Michigan case in the Supreme Court as well as Chenery. If the court considers that developments argument, the first point is that the language simply doesn't restrict EPA to considering developments. It says take account. If we apply Wild Earth and if counsel for the government is correct that they only thought they were coming up with the data to meet the 112F standard, then is there any argument on your behalf that they nonetheless don't meet the Wild Earth? The Wild Earth standard? I mean, I think it would be difficult. In fact, I find it very interesting that both counsel for EPA and counsel for intervenors seem to think that this process is a real remedy that would secure relief because by their own argument, this is in their brief at page 33, they say that the review of denial of petitions is extremely deferential. It's at the far end of the deferential scale. So according to the way they're looking at the statute, if EPA gets away with leaving listed hazardous air pollutants out of regulation and the law is that its emission standards are flatly unlawful, as is the case here, too bad because what they have succeeded in doing is converting what this court has already held as a clear statutory obligation that must be obeyed into a discretionary one. We're not prepared to—I mean, gets away with makes it sound like they're somehow shirking their statutory duties. They have a lot of different regulatory projects, and they're trying to figure out what they have to prioritize. And they're acknowledging that these standards are inadequate and that, in fact, it's unlawful not to regulate these unaddressed haps. And they're saying, among all the things we have to do, this is not something we're doing today. Right. And I would say that's the difference between an unreasonable delay suit and a nondiscretionary duty suit. And one thing that couldn't be clearer from the Act and all this court's cases interpreting Congress's decision to rewrite the Act in 1990 is that it didn't want the regulation of these hazardous air pollutants to be discretionary. That's why it listed them in the Clean Air Act. It doesn't clearly say that they're required to promulgate new standards. That's the Subsection 6 statute, isn't it? I mean, I asked you about it a while ago, and after you finally read a little bit of the statute, you still didn't say that, did you? Your Honor, revising as necessary includes adding limits that are required by the law, and the reason for that is that compliance with the law is necessary. You can at least construe it in your viewpoint of doing this to say that it clearly requires that. That's why the strips cancel, isn't it? Well, Your Honor, our point is simply that the as necessary, yes, as necessary does clearly require EPA to bring its emission standards into compliance with the law. But even if that were ambiguous, the other point is that counsel is relying heavily on this word promulgate, but it begs the question of promulgate what? If it were really promulgating emission standards, then it's no answer at all. Emission standards for source categories, then it's no answer at all, because emission standards for source categories can be revised by adding limits for uncontrolled pollutants. I'd also like to address the EPA's argument that it was really the fault of the district court for setting an unreasonable standard and that the agency didn't have enough data. In fact, the agency represented in sworn testimony to the district court that it had all the data that it needed. Now, if that wasn't enough data, it's hardly the district court's fault. If it was enough data, then it's not really a plausible excuse. Not that there is any plausible excuse for noncompliance with the law. You need to wrap it up. Thank you. Two quick points. Congress did provide repose. It provided that these standards would not change for eight years. It didn't provide any further repose than that. And finally, the idea that the unaddressed HAPs have been addressed, that interveners raised, is reputed by EPA itself, which acknowledges in the record that there are hazardous air pollutants that have never been regulated or controlled. Thank you. Thank you.
judges: Henderson, Pillard, Sentelle